This morning, and Council, you may proceed. Mr. Murphy, it is? It is Mr. Murphy. Thank you, Your Honor. And Mr. Murphy, could you tell me how much time would you like to reserve, sir? May I respectfully reserve three minutes? Three minutes it is. Go ahead, sir. I represent the Pittsburgh Post. The district court below issued a labor injunction in this case based on the 1994 decision of this court in Luden's, Inc. versus local fixed tobacco bakery confectionery and tobacco workers. It first found and implied, in fact, collective bargaining agreement between the parties, even though their last collective bargaining agreement had long since expired, and it then enforced a particular provision of that implied, in fact, contract. You gave us a lot of homework. We've done our homework. You're right. So let's get to it, okay? So the injunction here should be vacated for multiple reasons. First, as we said in our brief, this case involves a straightforward proposition that words mean what they say. Luden's itself said that no implied contract would arise at either party at the expiration of a collective bargaining agreement, expressed a clear particularized intent to disavow an implied agreement. And that's exactly, I'm glad you mentioned that, because I'd like to draw your attention, if I could, to the January 9th letter, and specifically the sentence, with respect to arbitration, the company will decide its obligation to arbitrate grievances on a case-by-case basis. I know you're familiar with it. You've probably looked at it about a billion times. I wanted to parse that through and ask you to explain the intent behind those words. The language, the company will decide its obligation on a case-by-case basis. We know that that language is drafted within the context of a legal principle that the parties are obligated to arbitrate and grieve matters that arose before the expiration of the contract. Correct? That's the proposition of law under Indiana and Michigan, as well as in Clinton. Correct? The company may not disavow completely its obligation to arbitrate post- expiration, but must consider arbitration on a case-by-case basis. And this is the company's expression of that. But let me ask you this. Those cases stand for the proposition that basically, if the events arose before the contract expired, you have to arbitrate those matters. That's what the language of those cases teach. The language as written here suggests that we're talking about a different category of things, because we know, you've said, we know what we have to do under the law. But this language seems to convey that we're talking about things that are outside of what our legal obligation is, that is, what we're required to do based on events that arose before the expiration of the contract. Isn't it a fair reading of this language to say that the company will decide its obligations on a case-by-case to capture things that arose post-expiration? Yes, it refers to grievances that arise after expiration of the agreement. And the reason it is framed this way is that a grievance that arises post- expiration may arise post-expiration, or it may arise under the collective bargaining agreement before expiration. I'm speaking about events. I understand your point. I'm speaking at events that occurred after expiration, like the events here. Events that arise after expiration would be captured by this language. The company will decide on a case-by-case basis whether to arbitrate, grieve those properties. That is correct. And so that's, so if that's how this language can be read, it's not a complete disavowal of the arbitration obligation. It's, it lets the reader know arbitration grievance could still take place. What's changed would be the company will decide. Correct. But what's the company's basis for deciding, right? You just followed Judge Schwartz's logic and the question I have is, by reading the sentence prior to the one that she just focused on, one would think the distinction that the paper is drawing is between what we are statutorily obligated to arbitrate and what we are contractually obligated to arbitrate. And that post March 31, we are not going to arbitrate those matters that we are, that we had previously been contractually obligated. Am I wrong about that? I think there is no statutory obligation to arbitrate post expiration. Here, the aim of the company was specifically. Isn't maintaining the status quo a statutory obligation? Yes, but the arbitration clause is not in the category of mandatory subjects that has to, as to which the status quo must be maintained as, as a function of the duty to bargain. The NLRB law is that an arbitration clause, like a no-strike clause, is one of the categories of mandatory subjects, if addressed in the contract, that falls away and has no further effect upon contract expiration. So does that mean that upon contract expiration, upon April, April Fool's Day, April 1st of 2017, you, you, you would view the arbitration as totally discretionary and not to be taken on or not taken on based on your view of a legal obligation? I think the view was that absent the sort of implied contract that Ludens would contemplate, which this language was intended to avoid, then the question about grievances that arose post expiration would be subject to the Supreme Court's test under Litton, which, which sets forth three criteria for when a grievance arises under the expired collective bargaining agreement, in which case there is an obligation to arbitrate, or if they're not in those categories of grievances that arose under the expired collective agreement, and their, their origin, their ideology is solely post expiration, there would be no obligation to arbitrate. And so what this conveys is that A, the company is not completely disavowing its obligation to arbitrate consistent with NLRB law, and second, as grievances arise post expiration, it will assess them according to the test in Litton financial systems, and if they are purely post expiration matters with no origin in the expired agreement, they may well not be arbitrable. On the other hand, if the grievance itself has its origins in the expired agreement, they may be arbitrable, and this conveys that the company, post expiration, will examine grievances along those lines on a one by one basis. So let's assume that we have that scenario where you have a grievance, a dispute that arises after expiration, meaning it, the events occurred post expiration, okay? Yes. And the company opts to participate in a grievance arbitration process to resolve that dispute. Would the, would the company be, and the union be following the step process that's in section 10 of the collective bargaining agreement to address it? Like what would, what, is that what would happen? Preceding arbitration, do you mean? Well yeah, preceding arbitration you have the grievance and the ten day review periods, etc. Is that how this would play out? Yes, because NLRB law says that post expiration an employer is obligated to continue to process grievances. However, when you get to the arbitration step, the end of the grievance procedure, the NLRB law is that arbitration doesn't survive contracts. So, merely because you process grievances post expiration, which you must do as a function of NLRB law, does not mean that you have to arbitrate them. Okay, but the language, this language back to the January 17th letter talks about its obligation to arbitrate grievances, which conveys, the language conveys that arbitration would be part of the process of resolution of whatever this dispute was. Am I correct? Depending on the case. So, let's take this case for a sec, and this will just give me some guidance. The record gives just a little bit of information about the status of a grievance, so it's possible your answer may go outside the record, you'll have to let me know that. But we know that a grievance was filed. We know from an affidavit or declaration from a member of the union, the president of the union, that the company's position was, we will not proceed to the status quo. We're not going to follow the status quo. But there's nothing in there that says we're not going to allow the grievance arbitration process to proceed. Am I correct? Right, because the complaint in this case didn't seek an order compelling arbitration. I'm aware of that. That's why I'm trying to piece together that which one I have. What is the status of the grievance, the November grievance? So, I think, I believe the record reflects, although I would agree in not expansive terms, that the events giving rise to this whole dispute occurred not back in 2017, but in 2019- I'm with you on that. As a result of the steps towards becoming a digital newspaper. I'm with you on that. I'm simply asking that after November 19, after the grievance was filed by the union, what's the status of that proceeding? The grievance was extant, was being considered by the company, and the union moved for an injunction. So, I filed a complaint seeking an injunction. So, is it still pending with whichever? So, it hasn't proceeded through the 10-day step? It has not proceeded to arbitration. Has it gone through the grievance? We know the steps I'm talking about in your, I'm sure you do, backwards and forwards. Has it gone through any of those steps? I think it has gone through some of them. I mean, oft times in contractual grievance procedures, the parties don't, they sometimes skip steps, particularly if it looks like a case that somebody may want to arbitrate. No, following every single step in a grievance procedure can be an exercise that doesn't take anybody anywhere. But I think the pertinent issue here is that the grievance was filed, the lawsuit was filed to enjoin a part of an implied contract, and it was without a demand for arbitration, and has not yet been deemed arbitrable. So, let me pick up on that. So, if I'm understanding you correctly, participation in the grievance process is not inconsistent with disavowal? Correct. Because in your view, participation in the grievance process is required by NLRB law? Yep. Correct. Okay. So, we go through the grievance process. Arbitration is not necessarily mandatory. And the way you've written the January 9th letter, the case-by-case basis is your determination of whether you're required by law to participate in the arbitration. Or, yeah, right, to participate in the arbitration, yeah. Correct. A response and an additional comment about that language in the letter. Go ahead. It is intended to say that when we, although we are obligated by law to process grievances, that the grievance is a post-expiration grievance that may or may not be arbitrable. That depends on the test applied in Litton, assuming this Luden's implied contract was disavowed, and that's a decision that would be made on a case-by-case basis. So, what the company was trying to do was both adhere to what the NLRB requirements were, and also written in contemplation of applying the tests of Litton Financial Systems to a post-expiration grievance. So, why is that unambiguous, right? Because we apply ordinary principles of contractual interpretation. We can't reach outside of the record, we can't reach outside of the four corners of the document to understand that intent that you're expressing. So, how is that, in your mind, objective and clear under the tests that have guided contractual interpretation back to the common law of England, that we can understand from the document what was intended? I think that leads me to the comment I wanted to make, which is during the term of a collective bargaining agreement, the obligation to arbitrate grievances is mandatory. When the Post-Gazette said that post-expiration, it won't be mandatory. We will decide in our discretion and in our judgment as to post-expiration grievances, whether we will arbitrate them or not. That's a disavowal of the obligation that existed during the collective bargaining agreement. It's mandatory during the term. This is a clear expression that it's not mandatory post-expiration. By making optional what was previously mandatory, your position is that that was a clear repudiation of the existing obligation, and therefore objective. And, in fact, given the Indiana and Michigan electric case that says we may not do a complete disavowal of our obligation to arbitrate, it's the most we could legally say. Really? Couldn't you have said we will only arbitrate that which we're required to by law, period? That's what you could have. We could do a lot of you coulda, you coulda. But I'm not sure you could say this is the most you could do, because there's language in other cases that attempt to achieve a goal of straight up disavowal. We will only arbitrate that which we're required to by law. Law requires us only to arbitrate that which is based on events that arose pre-expiration. Full stop. So that's why I, for one, have been very drawn by to this language, because that seems to convey a different message. And, in fact, the way you've explained it, it meant to convey a different language, different message than that other example of language I used. But an additional point here is that the district court below, this was not an action to compel arbitration. It was an action to enforce a specific term in the grievance procedure by way of injunction. The status quo. That is, let's keep everybody employed, paid, and health benefits. To get to the point of finding an implied contract that would cover that status quo provision, that's not the arbitration clause. The district court below had to find an entire implied, in fact, agreement and then find that this grievance procedure was included in it. But wasn't the status quo provision within the grievance arbitration provision in Section 10, which said, while we're attempting to come to a mutually agreeable resolution of this through alternative dispute resolution, we're not going to change things unless there's economic considerations that led to the company's decision or discipline matter. Neither of those exceptions apply. Why was the district court, if it concluded there was an implied contract to arbitrate, an implied agreement to continue to arbitrate, to include within it that which is within the arbitration clause, which is the status quo? I don't read the district court's decision as imposing an obligation to arbitrate. He does, in my view, conflate the grievance procedure. I stand corrected. I stand corrected. You're right. And as I've said, the obligation to process grievances does not automatically flow over into the obligation to arbitrate post-expiration. I understood you said that, too. But again, the language of this agreement, and again, we look for clear disavowals, the obligation to arbitrate grievances conveys that the company has decided arbitration will happen if we decide it to happen. Right. So here, earlier in that January 9 letter, the company said that when the current agreement expires on March 31, 2017, all contractual obligations shall expire. In our view, that included the status quo provision. I understand. Thank you. So let me ask you this. You can always quibble about whether you could have said something more clearly. But the question I have for you is, is the fact that there are, there is rather, more than one reasonable interpretation of how to take the case-by-case language, does that lead to the conclusion that there is not a clear disavowal? So what I specifically want to know is, Judge Schwartz has suggested to you a particular way of looking at that language. And then there's, of course, the way that you interpret the language. Is the fact that there are two reasonable interpretations of the language, does that undermine the notion or the conclusion that it's a clear disavowal? I do not think so, Your Honor. And I would say two things in response. I appreciate my time is up here, but. It's been up for a while, but look. Number one, I would reiterate what I said a moment ago. Even if one might have said this with better magic words than saying we'll arbitrate post-expiration on a case-by-case basis, to me it still operates clearly as a departure from what was the obligation to arbitrate during the contract term. And that's unmistakable. Before we had to arbitrate during the term, we said clearly post-expiration, it's our call, we'll make it case-by-case. That is far different than the obligation which is mandatory to arbitrate during the contract term. So could it have been worded differently? Perhaps. Do I think it's a disavowal? I do. The other part of it is that the district court seemed to say that the mere fact of this particular sentence about arbitration was enough to entirely undercut the disavowal earlier in the letter of all the other contractual obligations. In other words, just because the disavowal of arbitration in the district court's view was not as clear as it should have been, that's a basis for implying an entire implied-in-fact contract, including portions of the grievance procedure. And even if one quibbles about the arbitration clause, to me, the earlier part of the January 9 letter clearly disavows the rest of the contract, an implied-in-fact contract, outside of the arbitration clause, including that portion of the grievance procedure which the district court enforced by injunction. Can I ask another question? Oh, we're not done. Okay. Yeah. Okay. We didn't begin. So let's go back to a scenario where there's a grievance. And the company has decided to take on the obligation to arbitrate the grievance. Post-expiration. Correct. And it's on an event that arose after the expiration. Would the process that's being followed to address that dispute be following Section 10? Grievance, grievance, pick an arbitrator, et cetera. Would you guys be looking to Section 10? Because that seems to be what the course of conduct would have been in the past. Is that a fair statement that we would look at Section 10 of the expired CBI? I think you would look to it. But because the arbitration clause expires upon, with expiration of the collective bargaining agreement, even if the company agreed to arbitrate a post-expiration grievance, it doesn't have to do exactly what the arbitration clause requires. But what else would one be, well, let me ask you this. In the time since the expiration, March 31, 2017, the record is general in that the arbitration process and people comporting themselves consistent with the collective bargaining agreement continued. But my more specific question is, have there been any grievance arbitrations since March 31, 2017? Maybe there haven't been. In this unit. Because you do not believe there have been. Okay. So anything, so with respect to a grievance, you would be, you can't give me any kind of education on how things would play out. Because it hasn't happened. Right. Although what I would say is that as to the facts giving rise to this dispute, which relate to changes to a digital newspaper and the loss of jobs as a result of that occurring well after the expiration of the collective bargaining agreement, it's hard to see how those post-expiration events find their origins in the expired agreement back in 2017. I understand your position on that, Mike. It goes back to the language where the company has taken on the obligation to arbitrate grievances. If we're going to turn our attention to Section 10 to guide our activity, ours being the union and the companies, within that is the status quo. We're going to freeze frame things. So why is that not a reasonable interpretation of the events of the way this would play out? It is. Thank you. Okay. Okay. So let's go back to the district court opinion. One of the things that the district court said is that you could have said we disavow under essentially any and all. I think it said all circumstances. I have in my head for some reason any and all circumstances. Doesn't matter. Either of those will do. And we know that that's not possible because there are certain legal obligations that would preclude the paper from saying under all circumstances. Yep. So we start with that. So just one opening salvo before we get into the underlying. So either way this case goes, it would have to go back because the district court relied on that fact to come to its grant of the preliminary injunction. Agreed. Okay. So another thing in this line of reasoning that the district court used was it said that dues payoff and the union security were both contractual as opposed to statutory obligations. And I think that the recent Supreme Court case, at least on the dues payoff shows that it was in fact statutory and now maybe not so much. But at the time of the January 9th letter, it was statutory. Right. The NLRB law extant at the material time required the employer to continue dues checkoff. Right. So that couldn't have been a basis. It was adherence to statutory requirements, not evidence of an implied time. Right. But that was an improper basis for the district court to rely on, right? Because you had a statutory obligation. You couldn't have done different. Agreed. Okay. So here's the question I have for you. Union security, it's not clear to, I mean, obviously it arises from statute, but how do we apply union security there? I understand how dues payoff was an improper conclusion, but I don't understand how we can say the same of union security. I think without knowing that the language here is confusing for this reason. Typically in collective bargaining agreements, the dues checkoff provision, which through which the employer collects and remits dues to the union from the employees paychecks is in, is part of the union security provision. But legally they're kind of like the grievance procedure and arbitration. They are separable. The union security clause in its purest sense, leaving aside dues checkoff is the provision of the agreement that says that if a union member declines to pay dues, the union may require the employer to fire that employee. And cited in our papers, I think is the peerless case, which says that that union security clause expires with the contract. Separate away from that, the dues checkoff where the NLRB has gone back and forth about the obligation to check off dues, but there's no doubt that the union security clause ends when the contract ends. What's been less clear as the NLRB has shifted ground over at least since 2015 is whether the dues checkoff obligation continues afterward. Union security does not survive. In 2015, the NLRB decided, changing 50 years of precedent, that there was a statutory obligation to check off dues post expiration. And that changed again in December. But I understand if union security doesn't survive and the district court says that your persistence or your continuing compliance is evidence of a contractual obligation rather than a statutory obligation, why isn't on that point the district court right then? Because I think the district court was referring to our checking off dues. There's nothing in the record. And it writes, the opinion reflects the separation of the two, right? Dues payoff and union security. I'm not so sure it differentiates them very clearly. There's no evidence in the record, for example, about whether anyone was ever fired for failure to pay dues post expiration. It's simply not in the record. What the district court said about this was that the Post Gazette did not dispute that it continued to check off dues. That was raised by the union in their response to our motion to dismiss, to which we did not have a right of reply brief. And so our Post Gazette's position would be, yes, we continue to check off dues. We were statutorily required to do it. So it doesn't evidence an implied contract. Well, I totally get that. But let me ask a broader question, because I'm still confused by the union security. The district court's point, as I took it, was there are certain actions that the paper has taken that are inconsistent with disavowal. And for right or wrong, dues payoff and union security are two of those actions. We don't need to discuss anything more about dues payoff. Totally get it, right? But if union security is discretionary and you continue, now, if you tell me that the district court's wrong as a matter of law and union security, I get it. But if it's discretionary, then why isn't that ab initio sufficient to say, OK, they're engaging in things they're not obligated to. That's evidence that the disavowal couldn't have been as clear as they profess. It is not discretionary. The union security provision, compartmentalized away from the obligation to check off dues, has no efficacy after the contract expires and there's no discretion with respect to that. Lovely. We write the opinion the way you want it to be written. Where is it in the record that union security is an obligation so that we could say that its assumption with regard to that being discretionary or voluntary is wrong? Where would I look to for the site for that? Because I haven't found one. It is not, because as I said, the issue was first raised by the union in a response to our motion to dismiss. And we had no right of reply brief on that point. So we couldn't address it at the district court level. Well, does that mean it's as far as the record goes, it's a red herring that we can. Well, never been quite sure what the definition of a red herring is, perhaps. If you want to use another word, fine. But you know the meaning. So even if you go back to the Supreme Court's Litton decision, the references to union security and dues checkoff sometimes spill over into each other and the differentiation in the two concepts, which I tried to explain, is not articulated. We can kind of understand why they spill over, because if you don't have an obligation of a union shop, there would be no obligation to pay. So you can kind of understand why they get spoken about together. And what I, following up on what Chandrina was talking about, if the record before us, forget the reasons, just the record in front of us, demonstrates the district court did not clearly err in determining the union security component was still being respected. Therefore, the union was still recognized. It had a fact in front of it from which to infer there was a course of conduct that recognized the union and the employer's continued relationship, correct? But I think that the only thing that's in the record is the union statement. Well, but let's be fair to the district court. The district court did invite the company to adduce evidence. And as I understood the procedural history, the district court, in lieu of that, the union chose file motion to dismiss. So the record is, you're stuck with what it is, because the invitation was not accepted. So that's all we have. That's all the district court has. But I think I get your argument that your reading of Lytton would allow the notion that dues payoff and union security can be looked upon in the same way. I think the courts do not always distinguish them into the two pieces I did. I mean, the record doesn't reflect whether any employee was fired after contract expiration because they failed to pay dues. And I would submit to you, I would be relatively certain, although it's outside the record, that didn't happen because for the company to agree to enforce the union security that way would be an unfair labor practice before the NLRB. All right, thanks so much. We'll get you on the bottom. Good morning. Good morning. So you probably have watched the last few minutes and said, wow, I thought this was just going to be 15 minutes. Well, we'll see. But I know that myself and my colleagues have a few things to discuss. Sure. But you can begin the perfunctory introduction. And sure, Patrick Lemmon here on behalf of Apple E Teamsters 211, the court should affirm the district court for four overarching reasons. First, the court should disregard any of the employers' untimely arguments and facts raised after the district court's initial decision. Second, the district court properly applied lewds to this case to find an implied in fact contract. Third, nothing about the Supreme Court's Reese or Tackett decisions calls the Third Circuit decision into question here. Last, the district court properly held that the union satisfied the requisite elements of injunctive relief in ordering maintenance of the status quo while the party's industrial dispute proceeded to arbitration. Well, you could tell probably from the line of questions that we were, all three of us were putting to your adversary, it's the implied in fact component that we've been interested in asking about. Sure. So much like I did with your adversary, I'd like you to take a look at that one sentence in the January 9, 2017 letter, which says with respect to arbitration, the company will decide, et cetera. Sure. A point your adversary made was that this was notice that there's no longer sort of a agreement to proceed to arbitration and now it's a unilateral decision vested by the company. Isn't that a significant disavowal of what had previously been a mutual agreement to proceed to alternative dispute resolution? Well, I think when the Post Gazette said that it would arbitrate cases on a case by case basis, in a sense, that was just a recognition of what it already has to do under the arbitration provision. Well, that presumes that the arbitration provision is in effect at the time of the agreement, so let's make sure we're focusing on the right period of time. I don't think there's a dispute that if a disagreement, I should say, among the parties that if a series of facts arose before expiration, there's an obligation to grieve and arbitrate that consistent with the terms of the collective bargaining agreement. We're now going to focus on the events that led to the dispute happened after the first 2017. According to this letter, it seems to be, it could be read to communicate that for such events, we, the company, are going to decide whether we'll arbitrate or not, therefore taking away sort of that mutuality. So how is that not a disavowal of the mutual agreement to arbitrate? Yeah, I think I understand your question. My point is that under a valid CBA that hasn't expired, the company has to arbitrate cases on a case-by-case basis. So the recognition that they had to post-expiration arbitrate cases on a case-by-case basis is essentially the same obligation it had before. Are you saying that once a grievance arises under a valid CBA, that when the grievance process is exhausted and it comes to the stage of the proceedings where it should go to arbitration, that the paper always has the discretion to engage in the arbitration? Let me offer an example of something they, employers regularly argue that they don't have to arbitrate. Something that does not allege a violation of the contract, for instance. They wouldn't be obligated to arbitrate that. But something that were a violation of the contract or alleged a violation of the contract, that is something they would be obligated to arbitrate. Right. So your understanding of case-by-case basis, you understand that to mean we're going to make sure it's really arbitrable. Correct. That's what you understand case-by-case to mean. But that sentence would be superfluous, right? Because what you're saying is we interpreted that sentence to say the self-evident, which is you're going to do what you always do. Is that what you're saying? Yeah. Because you're saying that, tell me if I'm wrong, because I want to understand. If a CBA is in effect and you get to the arbitration process, you're either, you're going to make a decision, this is arbitrable or it's not. Now, post-CBA, you interpret this sentence, just so the record is clear, we're talking about the last sentence of the second paragraph of the January 9th letter, of the January 9th of 2017. You interpret that letter to be just saying what's self-evident, which is when the grievance process runs its course and we get to the point where arbitration is supposed to happen, that all they're saying is if it's arbitrable, we're going to arbitrate. If we don't think it's arbitrable, we're not going to arbitrate. And that's it. That's correct. I'd take it one step further and say, even if Your Honor doesn't view that as a reasonable reading, there's nothing about that that serves as a specific repudiation. Arbitrating something on a case-by-case basis is not a repudiation of their obligation to arbitrate. But that sentence follows a general repudiation of the entirety of the contract, right? And so we read this in the context of the whole letter. So help me understand why the greater doesn't include the lesser. Sure. So if you read through that communication, they say, the Post-Gazette states that it will, you know, all of its contractual obligations will cease and it will honor only those that are statutory. I'm paraphrasing, but that's the essence of it. It then goes on to carve out arbitration as something that it would continue to consider on a case-by-case basis. So it's essentially carved out arbitration, the arbitration procedure from those things that was repudiated. Is that the best reading of this letter, though, Counselor? I understand what you're saying, which is it's a repudiation, except we're going to do this. But it would seem the way you would ordinarily read this is the contract is done. There is no more contract. Now, here's what we're going to do going forward in our continuing relationship. I, that seems like the normal way we would assume that a new term is introduced into a party's agreement once you cancel the existing relationship. But you're reading it differently. And I'm wondering where in the letter you can ground me in some text that would give you that alternative meaning. I think you've grasped, you know, the position that we have, which is that they carved out arbitration as an exception to their whole contractual repudiation of other things in the contract. And I also think it's worth noting that here the obligation not to strike or engage in a sort of work stoppage is generally the quid pro quo for a agreement to arbitrate. That ensures that industrial disputes the union may have will be resolved, while also giving the employer some assurances that they're not going to face a strike because of a disagreement. Here, there's been no work stoppage. There's been no economic action against the employer on behalf of the union. I think that's further evidence that the arbitration provision has survived under Lutz. Well, well, let's, let's not go further than January 9th for the moment. Okay. Okay. I'm not quite sure you answered Judge Mady's question. Let me, let me say why. In asking you to take a look at the entire agreement, the ultimate question that we all are grappling with is, why isn't this a disavowal? The paper says it's a clear disavowal. You say not. And the specific question that Judge Mady asked you is, when you look at the preceding sentence, talking about what obligations continue and what obligations don't, that leads you to read the last sentence of the second paragraph in a particular way, right? So it would be helpful if you would say, number one, why is this, when you, when you look at the letter as a whole, why isn't it a disavowal? Now, I understand your argument, just looking at the last sentence, that all it's saying is arbitration sometimes and not arbitration others. But when read as a whole, when that paragraph is read as a whole, is it that it's confusing? You suggest in your papers that there was a better way to say it. And I guess part of my question is, is there something confusing about, about this so that your suggestion is the better way makes more sense? I know those were a lot of questions, but I think you understand the general parameters of what I'm trying to grapple with. Yes. I mean, I think on the first point, I think that when they say that all contractual, when the Post Gazette says all contractual obligations will cease and they will only honor statutory obligations, and then they go on to carve out, as I was mentioning before, they go on to carve out arbitration as something that is going to continue at least on a case by case basis. That's, that's sort of the one point and an attempt to address some of, you know, some of your concerns on that first point. And then with respect to, you know, whether this was a clear repudiation, I think it's, in the union's perspective, it was not. I think there are a number of different things they could have said to repudiate, you know, part of the arbitration provision. They could have said that they wouldn't continue to honor the status quo provision. Because I want to, I want to take your lead and pick up on something Judge Greenaway said. Because Judge Greenaway asked you, is this a question of contractual ambiguity or the way to say it from, from your perspective? And I think that's a great point because if it's in the former, then grounded in ordinary principles of contractual interpretation, we would have ambiguity and we may need to resort to extrinsic evidence to understand it. And, and that takes us down one. But if it's the latter, then it really doesn't rise to the level of something that we in this posture can begin to rewrite. So is it ambiguous or is it, there's some things they could have done and we wish they had, and where do you see in the text one answer or the other? Well, I think, I would say that it's not, it's ambiguous in the sense that it's not a clear repudiation. So I would say that. I'm not sure if that exactly answers your question. I think what, if you're saying it's ambiguous because it doesn't constitute a clear ambiguity, tell us why. Without saying, because it could have been written in a different way. What makes this sentence ambiguous? And I hate to go back to the same thing that, but to us, it is ambiguous because they state that they will arbitrate on a case by case basis. That's not a full repudiation. I think that's language that shows that there's another way they could have done it. So are you saying that the case by case basis representation here says there's a willingness to continue to arbitrate despite the fact, three lines earlier, we said we're not going to, all other contractual obligations have expired. That's correct. Post March 31, 2017. Are there matters that the paper is, that the paper is legally obligated to arbitrate? Are you referring to this dispute or now or moving forward? This dispute. Yeah, I think they are obligated to arbitrate it. No, not, not pursuant to the CBA. Are there, are, are they, are they, um, are they statutorily required to arbitrate it? Is that the question? Are there any matters post March 31 of 2017 that the paper is statutorily obligated to arbitrate? My understanding is that, uh, that obligation to arbitrate does not continue statutorily post expiration. So you say there are no, there, there, there is nothing that they have to arbitrate. From a stat, from a statutory perspective. Correct. Okay. So the only thing post March 31 of 2017 that you believe, um, arbitration would be appropriate is, um, contractually. Correct. I mean, the union would still have other rights to pursue an unfair labor practice before the board, but that wouldn't be with respect to arbitration. Arbitration arises as a contractual. Is there any evidence in the record that the paper post March 31, 2017 engaged in arbitration with regard to contractual obligations that arose from the CBA? Is your question whether they've actually taken anything to arbitration since expiration? Is that what you're asking? I thought my question was clear, but I'll, I, I, I want to know, um, can we look at the record and say, yeah, here are the three instances. Here are the four instances. Here's the one instance where post CBA, they obviously arbitrated, um, an obligation that arose contractually. I mean, their, their letter states very specifically, we're going to adhere to our statutory obligations and not our contractual. So I want to know, is there an instance where they arbitrated something contractually that right. Something that they were contractually obligated to arbitrate and not statutorily obligated. There's nothing in the record of a, uh, these parties going to arbitration, uh, post expiration. Uh, I'm not sure. I can't say with certainty, but my understanding is that they haven't acted then assuming that's correct as nobody's got to write. So, so they haven't acted inconsistently with what their, their, uh, um, intent was as expressed in January 9th, 2017 letter. Correct. But my understanding is they haven't acted inconsistently, uh, with their obligation to arbitrate either because none have arisen that would have gotten to arbitration. So they, they haven't either disavowed it by refusing to arbitrate or recognize it by going on to arbitrate. There's no evidence. So, so if we look at the case by case language at the last sentence of the third paragraph, unless we say that, unless we determine that that's inherently ambiguous, you lose. I'm not sure. I understand the question. I'm trying to figure out what, what, what, what's, what's clear about the question. If, if we determine that the last, unless we determine that the last sentence of paragraph two is ambiguous, right. You lose. Yeah. I think if you were to find that they had effectively disavowed their obligation to arbitrate, yes, I think we would lose. But that's, that's, we don't have that here. That's our, I, I, I know that, but what I'm trying to figure out is, is your, is the crux of your argument that that sentence is inherently intrinsically ambiguous. It's not, I'm not hiding the ball. It just, that's a yes or no. Right. I would say it's certainly not an effective disavowal. And is it because it's, why? I mean, because it is, it is ambiguous. Okay. If I could just ask a question on a slightly different topic. Assume for the purposes of this question that the implied contract has found to exist. One of the things that we need to also consider in this context is, would it be a hollow arbitration process if the status quo were not respected? And we have to consider whether the district court was correct in finding, among other things, irreparable harm in imposing the injunction. Correct. Okay. There is case law that talks about the failure to continue to maintain health care benefits could lead to irreparable harm. But could you find any case law that says the failure to maintain the employment status or wages is irreparable harm? No, there, there's no cases that we've cited in our brief that says mere loss of wages. I think if- Do you have any argument for that? Because it kind of goes back to, is, isn't it, at a minimum, is the district court's injunction overbroad by, by requiring continued employment and payment of wages where that, those circumstances are not good, but they're not irreparable because they can be recompensed with money, where the health care falls into a different category under Fort, Fort, Fort Pitt. Yeah, well, let's set aside the health care part because I think we think that is- Irreparable. Irreparable harm. But sort of addressing the wages and the reinstatement issue, I think the union's basis for irreparable harm there is, you know, if the host gazette is allowed to continue doing those sorts of things, it would really create some serious negotiating leverage for them in an ongoing relationship. But how is that irreparable? I mean, we're in irreparable harm land. While we're in equitable relief before a United States district court, how is that irreparable? Well, I- And is it the court's role to even be insinuating itself and even considering a leverage that one side might have over another? Right. And I do think it is, you know, it's sort of inextricably linked with the health care issue as well because, you know, they have health care through their employment with the post-gazette. I understand that they have that, but if the injunction were tailored to read that the status quo only needs to be maintained with respect to provision of health care benefits because the failure to provide it could lead to irreparable harm, that's irreparable harm. But I still don't follow you on how lost wages are irreparable when you can be recompensed with money if the arbitration is successful to the union's favor. Right. You with me? Yeah, I am. And I don't think we have a case that stands for that proposition. OK. I appreciate that. Thanks. So I wanted to ask you something that I asked your colleague about dues checkoff and union security. Right. Do you recall that? Of course. Great. Good. So tell me, clearly, the district court relied on those two actions by the paper as being evidence that there wasn't a disavowal. I want to know first, do you agree that at the time of the writing of the letter and at the end of the agreement on March 31st of 2017, there was a statutory obligation to comply with dues checkoff? That was under the board law. Yeah, yeah, yeah. But I would say under Litton, the Supreme Court case, I don't know that that, if you look at Litton, dues checkoff and union security were not a statutory obligation that continued. They were contractual obligations that continued. So I think there was a bit of tension there with the board decision. And one more point I would say, when Valley Hospital came down, which was the decision that came down in December of 2019, that was a board decision which overruled that decision and it applied retroactively to pending disputes. And this dispute was pending. So our position would be that it applies retroactively to this as well. Valley Hospital came out before the initial TRO? No, no. It came out after. Yeah. OK, so the retroactive effect makes the second decision by the district court valid then because Valley Hospital at that time would apply because of the retroactivity? That's your point? Sure, yeah. OK. Thanks very much. Thank you. I will be brief. OK. Returning perhaps to everyone's pain, the January 9 letter. The first part of that letter is clear in saying all contractual obligations expire. The statement about arbitration farther toward the end of that letter is consistent with what is said earlier in the letter, that the company will observe its legal obligations, but all The problem is arbitration is different. It expires. There's Supreme Court decisions about when post-expiration grievances may or may not be considered. And so the statement that the Post-Gazette would consider post-expiration grievances case-by-case is an effort to comply with that state of the law. And it was consistent with what it said earlier about observing legal requirements in that very same letter. So your point is when your adversary says in their papers that arbitrate only cases that the law requires, that that language is synonymous with the language that you've used in the last sentence of paragraph two. I do not see a significant difference. You know, Whitten said post-expiration grievances that will arise under the contract, that expired contract can be arbitrable only where they involve facts or occurrences that arose before expiration, where the post-expiration action infringes upon a right that vested or accrued during that now expired collective bargaining agreement, or where under normal principles of contract interpretation, you can look at the expired agreement and see the contractual rights survive the expiration. It's not in the record here. There was a Litton letter was sent regarding the arbitrability of the underlying grievance here, taking the position it's not in the record, that under that standard, it's not an arbitrable grievance. On this Valley Hospital, I would just say this. Litton was decided in 1991. At that time, the law was that there was no statutory obligation to check off dues. There was a statutory obligation to check off dues at the material time period here, because the board changed that law that had been extended for 50 years in 2015, and it's only in December of 2019 that it changed it back to the prior law. Your adversary talked about a tension between Litton and the 2015 NLRB decision. There's no question that once that NLRB decision comes out in 2015, you've got to comply with it. Absolutely. To fail to do so would be to subject the company to an unfair labor practice charge. And that's all I have. Thank you very much. All right. Thank you.